(No. 34587.—                    )

THE PEOPLE OF THE STATE OF ILLINOIS, Defendant in Error, *vs.* LIVINGSTON McGRAW, Plaintiff in Error.

*Opinion filed March 20, 1958.*

WESTBROOKS, HOLMAN & E. F. JOHNSON, of Chicago, (CLAUDE W. B. HOLMAN, EVELYN F. JOHNSON, and RUSSELL R. DE BOW, of counsel,) for plaintiff in error.

LATHAM CASTLE, Attorney General, of Springfield, and BENJAMIN S. ADAMOWSKI, State's Attorney, of Chicago, (FRED G. LEACH, WILLIAM H. SOUTH, FRANCIS X. RILEY, and JOHN J. STAMOS, of counsel,) for the People.

Mr. JUSTICE HOUSE delivered the opinion of the court:

This is an appeal by the defendant, Livingston McGraw, from a conviction of murder in the criminal court of Cook

County. He was tried by a jury and the court entered judgment on the verdict which fixed his punishment at imprisonment in the penitentiary for a term of 14 years.

The indictment for murder arose out of the undenied shooting and killing of one Richard Roushorn, a Chicago police sergeant, following an altercation over a slight collison. A motion for directed verdict at the close of State's evidence and at the close of the case was overruled. After verdict, a motion for a new trial was made. The defendant then withdrew his motion for new trial and, with leave of court, filed his motion to set aside the verdict and to enter an order discharging him on the ground that the evidence was insufficient to support the verdict and that he acted in self-defense.

The State contends that since the bill of exceptions lacks a motion for a new trial, this court is precluded from reviewing the sufficiency of the evidence to sustain the verdict. The purpose of a motion for new trial is to give the trial court an opportunity to pass on alleged errors. Here the defendant takes the position that he did not want a new trial and there was no reason to ask for one. After leave of court first had, he filed a motion challenging the sufficiency of the evidence and alleging no other error. No objection was made by the prosecution to the procedure in the trial court, but it now objects to the defendant's right of review. In this case, we hold that the trial court had ample opportunity to, and did, pass upon the sufficiency of the evidence not once, but three times, and to invoke the rule that the defendant is precluded from review under the circumstances here presented would be manifestly unjust. Cf. *People* v. *Flynn,* 8 Ill.2d 116.

The defendant was driving a bomber-type city garbage truck south on South Parkway just south of 63rd Street in the city of Chicago. Roushorn, in plain clothes, was proceeding in the same direction in his personal Dodge automobile. Without the knowledge of McGraw, his truck

scraped the rear fender and door of Roushorn's car causing damages variously estimated from $5 to $20. A northbound motorist indicated by signs to McGraw that someone following was trying to gain his attention. McGraw parked at the curb on the west side of the street, several hundred feet south of 63rd street, and walked back to meet Roushorn. The latter parked his car about 5 feet east of and parallel to the west curb, and walked south a few feet where he met the defendant.

While there are minor discrepancies in the testimony as to the happenings from the time of their meeting to the actual firing of the fatal shots, the record establishes the following facts. Roushorn became very incensed and repeatedly accused McGraw of deliberately sideswiping his car. This was denied by McGraw, who indicated they could straighten the matter out without trouble. Roushorn finally became so aroused that he slapped or beat the defendant about the head and dropped the latter to his knees. McGraw saw that Roushorn had a revolver in a holster at his hip and a blackjack in his pocket, and realized that he was a peace officer. He begged not to be hit again and suggested that he be arrested. No effort was made to give him a ticket or arrest him, except that the officer said if he would drive down the street he would arrest him there. Both McGraw and the spectators asked that the arrest be made right there. McGraw, after having been hit several times, told Roushorn that he would not be doing this if he didn't have a gun. Thereupon the officer went to the street side of his car and took off his belt and holster containing his revolver and placed them in the drivers' seat. He returned to the front end of the car and again approached McGraw, either again striking him or attempting to. A bystander, David Meizlish, got between them as a peacemaker and suggested that they not act like children and let him straighten it out. While Roushorn was talking and arguing with Meiz-

lish and others in the crowd, McGraw went to the car and got the officer's revolver. He had difficulty in getting it from the holster and the belt and holster fell to the pavement. After removing the gun, he went past the left front fender and made a remark which was variously described as: " Now I am in command," and "I'm on the end of the gun," and "Now I've got the big end of the stick." The defendant testified that he said, "I've got the gun now." The crowd too yelled: "He's got your gun." Roushorn was, at this point, standing near the curb at the right front fender of his car. McGraw had walked up from the left side of the car to a point near the left front fender.

There is no question but that the deceased was the aggressor. All eyewitnesses, both for the prosecution and the defense, testified without exception that Roushorn struck all the blows, that the defendant offered no resistance at any time and that his first aggressive act was the procurement of the gun. The only real question is whether the evidence establishes the guilt of the defendant beyond a reasonable doubt in view of defendant's plea of justifiable self-defense.

Despite the fact that a large crowd was attracted by the altercation, variously estimated from 25 up to several hundred, the State produced only two eyewitnesses to the actual shooting.

Joseph H. Abhsie testified that he was in a car parked near the one here involved, that defendant fired two shots and the deceased fell facing forward about 5 feet from the curb and 8 feet from the defendant. The latter then walked over, pointed the gun down and fired about 4 more shots down on the deceased. The defendant then replaced the gun in the car and began pleading with bystanders, but the witness could not hear what he said.

Witness Virgil M. Poole, Sr., a Park District detective, testified that he was driving north on South Park

and when 35 or 40 feet away, he saw a man with a revolver pointed at a 45 to 50 degree angle to the ground firing, and that he heard 2 or 3 shots. The man ran back to the car, threw the gun in the window and then ran back to a multitude of people gathered there. The officer procured the gun, placed the defendant under arrest and took him to the officer's car. The defendant said to him: "Officer, I had to shoot him because I couldn't stand to be hit on the head any more." The officer then went back to pick up the belt and holster and left defendant with an unarmed bystander. He saw the body of the deceased lying face down against the west curb with the head facing south.

The only other witness called by the State who was at the scene just prior to the shooting was the witness Meizlish. He testified that at the time McGraw started toward the car, presumably to get the gun, he ran and hid behind a shoe-shine stand where he heard from 4 to 6 shots which were fired without hesitation between them. He then went out and saw the fallen officer lying about 2 feet from the curb.

The defense produced 4 witnesses at the scene of the shooting. Margaret Salley verified the striking of defendant and said that people in the crowd were shouting to Roushorn, "That's not the way to treat a person," and "He's a human being." She further testified that after McGraw obtained the gun, the officer turned and started back at McGraw, that the gun clicked, that the officer continued toward the defendant and the shots were then fired continuously. Her testimony about the click or cocking of the gun and the movement of the officer toward McGraw was verified by witness Lenora Redd.

John Cash, an engineer for the police department, testified that the officer turned and started toward McGraw just before the shots were rapidly fired. Loyal Nichols

testified that the officer drew up his foot as though to kick defendant when he reached for his hat which had been knocked off, and reached for his gun but did not draw it. He said the officer was standing when the shots were rapidly fired.

The defendant testified on his own behalf. He had never met the deceased before, and his testimony substantiated the statements of other witnesses relative to events leading up to the altercation. Roushorn never told McGraw that he was a police officer, but when McGraw tried to pick up his hat which had been knocked off during the blows to his head, Roushorn opened his coat and McGraw saw the gun and a blackjack. He testified that he thought the man was some kind of an officer and begged him not to hit him any more but to arrest him. Roushorn placed his hand on the gun several times and when he did so, he brought back his right foot.

McGraw further testified that he got the gun to prevent further beating, and told Roushorn he had the gun so he would stay off him. He was holding the gun at arms length at a downward angle. When Roushorn started toward him he cocked the gun and when the officer continued coming with raised fist and gritted teeth, he closed his eyes and started pulling the trigger. He said that he wanted to shoot Roushorn in the leg to prevent his getting close enough to take the gun away and kill him. There were some discrepancies between his testimony and a statement given to police, but when the statement was shown to him later, he insisted that some of it was incorrect and had to be deleted.

The defendant proved a good reputation as a peaceful and law-abiding citizen by seven responsible citizens and no evidence was offered to the contrary.

Dr. George Goldenberg, coroner's physician and pathologist, testified that two bullets entered the body in the

abdomen just above the belt line and each ranged slightly downward and that either could have caused Roushorn's death. While the witnesses differed as to the number of shots, all six cartridges in the gun had been fired.

It was stipulated that the defendant was 5 feet 8¾ inches tall and weighed 175 pounds, and Dr. Goldenberg testified that Roushorn was 45 years of age, was approximately 6 feet 1 inch tall and weighed about 240 pounds.

The parties agree that the established rule with respect to self-defense is that when a person is in a place where he has a lawful right to be and is unlawfully assaulted by another and put in apparent danger of his life or great bodily harm, he need not attempt to escape but may lawfully stand his ground and meet force with force, even to the taking of the assailant's life, if necessary or apparently necessary to save his own life or to prevent great bodily harm. *Hammond* v. *People,* 199 Ill. 173; *People* v. *Durand,* 307 Ill. 611.

In applying the rule to the facts before us, we find the defendant peaceably on a public street in his employer's business, when he is made the subject of a totally unwarranted and unprovoked attack. The aggressor showed no sign of giving up the attack, despite the efforts of bystanders to restrain him. In the face of the request by the defendant and the assembled citizens that he cease the beating and arrest the defendant, he took off his gun and returned to the arena. The defendant appears entirely justified in his belief that the gesture of removing the gun was to precede a continuation of the punishment. There is no reasonable contrary explanation for the removal of a gun which he, as a police officer, had a lawful right to carry.

The prosecution argues that after placing the gun in his car, Roushorn rushed by the defendant without harming him. The latter was stooping at the time to get his hat and it is not improbable that the officer failed at once to

see him. The more consistent explanation seems to be that Roushorn's actions had aroused resentment in the crowd and that he was in angry argument with members thereof.

Under the rule, the defendant was not obliged to attempt to escape in any case. Certainly this is all the more true when he was dealing with an officer of the law who should have been making an arrest if he had reason to believe that the defendant had violated the traffic law. The procurement of the gun was consistent with defendant's right to stand his ground and ward off bodily harm by a larger man who still had a lethal blackjack in his pocket within instant reach of his hand.

This brings us to the crux of the matter, as to whether it was necessary or apparently necessary to fire the gun to stop further assault. The defendant says that when Roushorn turned to face him he cocked the gun which made a discernible "click" and that when the officer started toward him he was afraid he would take the gun away and kill him (McGraw) with it, and he then closed his eyes and started pulling the trigger hoping to hit Roushorn in the legs. The evidence is conflicting on the question of whether Roushorn was moving toward McGraw when the shots were fired; in fact the witnesses were about equally divided on that point. From the location of the body after the shooting with reference to Roushorn's position just prior thereto, it is apparent that he had not progressed very far.

In determining the question of apparent necessity, we must view the situation through the eyes of the defendant. He was frightened (had been stunned by the blows as one witness put it), he had reason to believe that the attack would be resumed because of the removal of the gun, and knew that his huskier assailant was capable, both physically and by temperament, of doing him bodily harm

since he had done it once. Roushorn was moving toward him, or he thought so (as did several of the witnesses), and he knew the other had a blackjack.

After reviewing all the evidence, including that of the peaceful reputation of the defendant, we entertain not only reasonable, but grave doubt as to his guilt. His actions immediately following the shooting were those of a man who felt he had done something which he thought he was forced to do. He immediately told officer Poole who arrested him that he had to shoot because he couldn't stand to be hit over the head anymore and asked Poole to get some of the people's names so they could tell how it happened. He apparently did not have the looks and demeanor of a murderer since officer Poole left him in his car attended only by an unarmed, unsworn citizen while he went back to pick up the belt and holster.

The judgment of the criminal court of Cook County is reversed.

*Judgment reversed.*